## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

Ron Genova M.D.

Plaintiff,

v.

BANNER HEALTH, an Arizona Non-Profit Corporation;
NORTH COLORADO MEDICAL CENTER, a d/b/a for Banner Health;
Rick Sutton Individually and as CEO and an employee of NCMC,
Defendants.

_____

Attorney(s) or Party Without Attorney:
Name:              Charles H. Torres, Esq.
                   CHARLES H. TORRES, P.C.

Address(es):       303 E.17th, Ave, Suite 920
                   Denver, CO 80203
                   Attorney for Plaintiff
Phone Number(s):   (303) 830-8885
Fax Number:        (303) 830-8890
E-mail(s):         Chas303@aol.com
Atty Reg #:        7986


## COMPLAINT AND JURY DEMAND

COMES NOW Plaintiff, Ronald T. Genova, through his undersigned counsel, and hereby respectfully submit this verified *Complaint and Jury Demand*.  Plaintiff sues the Defendants, and each of them, and hereby state, allege and aver as follows:

## JURISDICTION AND VENUE

1.      Plaintiff asserts federal jurisdiction under 28 U.S.C. § 1331 for the EMTALA claim for violations of the 42 U.S.C. § 1395dd.   The Court may exercise jurisdiction over Plaintiffs' supplemental (ancillary) claims, set forth below, pursuant to 28 U.S.C. § 1367.

1

2.   Additionally, this Court has jurisdiction, and venue is proper under federal diversity jurisdiction pursuant to 28 U.S.C. 1332 as a majority of the Defendants, are residents of this judicial district and Plaintiff is a resident of Arizona.  Additionally, the acts complained of herein occurred within this judicial district. The amount in controversy is in excess of $75,000.00.

3.   An actual controversy exists between the parties hereto regarding the claim(s) for relief set forth below.

## NATURE OF THE CASE

4.   In this civil action, Plaintiff is suing the Defendants, and each of them, to recover compensatory damages.  Defendants, and each of them, have been engaged in a course of conduct which has subjected Plaintiff to embarrassment, humiliation, harm to his professional reputation   and considerable financial loss.

5.   This matter does not arise out of any "qualified professional review committee activity" (peer review/Fair Hearing) at Defendant North Colorado Medical Center (hereinafter referred to as "NCMC", or the "Hospital"), and Plaintiff does not need to seek review with the Committee on Anti-Competitive Conduct.  Defendants' actions were under taken while attempting to engage in the unauthorized practice of medicine and for business and financial reasons other than patient safety.

## PARTIES

6.   Plaintiff, Dr. Ronald T. Genova, is a resident of Arizona and is an emergency department physician who at all relevant times had privileges at Defendant NCMC.  Hospital and provided emergency department services to NCMC in Greeley Colorado.

7.   Defendant, Banner Health (hereinafter "Banner"), is an Arizona Non-Profit Corporation, authorized by the Secretary of State of Colorado to do business in the State of Colorado, with Colorado offices located at 1801 16th Street, City of Greeley, County of Weld, State of Colorado  80631.

8.   Defendant NCMC operates as a hospital, and is a trade name for Banner, with offices located at 1801 16th Street, Greeley, Colorado 80631.

9.   Defendant Rick Sutton (hereinafter "Sutton,"), upon information and belief, was a citizen of the State of Colorado and was the  Chief Executive Officer (CEO) at NCMC, who was employed by NCMC/ Banner during all relevant times and the individual that caused the damages complained of in this complaint.

10.   Defendants NCMC/Banner are vicariously liable for the intentional and/or negligent acts, errors, and omissions of its employees, partners, owners, and/or representatives, named

2

herein as Defendants, as said acts, errors, and omissions were either committed within the course and scope of said individuals' respective business relationships with NCMC, and Banner with NCMC/ Banner ratifying, directing, and/or authorizing said individuals' respective conduct, acts, errors, and omissions.

11.     North Colorado Emergency Physicians (NCEP) operates an emergency service with its office located in Greeley Colorado.

### BANNER'S RELATIONSHIP WITH NCMC

12.     Banner has an agreement with NCMC to operate and manage NCMC as Banner Health, d/b/a NCMC.

### QUALITY CARE ALLOWED TO SUFFER

13.     Since Banner took over operation of NCMC, there has been considerable dissatisfaction with patient care under Banner management.   Large groups of physicians, from various specialties, have openly criticized Banner in public forums.

14.     That Sutton and NCMC/Banner were concerned about patients being diverted to neighboring hospitals:  Poudre Valley Health System Hospitals in Fort Collins that had become a major competitor of NCMC a concern that was the subject a number of newspaper articles chronicling NCMC's concern about the loss of patients to its competitor.

15.     That the concerns regarding competition was based in part on local doctors concerns about the relative level of care and hospital options that were being provided at NCMC and the neighboring hospital.

16.     The atmosphere and environment out of which this Complaint arises is no accident and has nothing to do with patient care issues controlled by, or within the ambit of, the Peer Review Process.  The actions of the Defendants do not arise from some isolated misunderstanding or disagreement between the parties. Rather this action arises out of the NCMC Defendants attempts to practice medicine without a license and engage in a pattern of practice meant to minimize compliance with federal law, specifically the Emergency Medical Treatment and Active Labor Act (EMTALA) and state laws protecting individuals being seen at the NCMC emergency room. In so doing Defendants interfered with Plaintiff's ability to carry out his medical obligations and lawful duties and interfered with his agreement with his practice group (NCEP) resulting in loss of income to Plaintiff.

17.     As a result of Banner's approach, many respected specialists and physicians have either been driven out of the Greeley and/or northern Colorado medical community, or have chosen to leave due to the hostile and unprofessional environment championed by Banner.

18.     Defendants NCMC and Banner have now publicly admitted that emergency room patient

care has also suffered under hospital management confirming the allegations made in this complaint.

19.   NCMC/Banner representatives and Defendant Sutton admitted on February 22, 2011 in a statement provided to the Greeley Tribune, numerous deficiencies in hospital management of the emergency department relevant to the issues in this case:

  a.   Al Dominguez, NCMC, Inc. board chairman, said Phoenix-based Banner Health, which manages the hospital, made the change to improve patient care.

  b.   Dominguez said hospital officials wanted to reduce the amount of time patients spend waiting in the ER.

  c.   CEO of NCMC Rick Sutton stated: "I wanted to change the culture and management structure."

  d.   Sutton stated "the move is designed to change the management culture to improve patient care and the doctors' experience."

  e.   "We have some wonderful physicians. We have great providers, and it's just a matter of how we're going to structure the management and align them with the hospital and move us into the future."

  f.   Sutton stated he looked to an outside management company-instead of managing the ER doctors in-house- because the management company offers expertise the hospital didn't have.

20.   Sutton was in fact in charge of managing the emergency department physicians during all relevant times and was the cause of all of the above stated concerns.

21.   Sutton had been warned numerous times by the emergency department physicians including, Dr. Genova, of conditions that were endangering patients' health and causing extended stays in the emergency department for patients.

22.   Emergency room physicians, including Dr. Genova, created protocols and procedures to address these issues.

23.   Consistently, Sutton refused to implement these procedures and encouraged hospital staff to resist implementation of said procedures.

24.   It is in fact Sutton's lack of management skills and lack of interest that brought about the need to change emergency department management.

25.   That the hospital was on notice for months of Sutton's deficiencies and lack of compliance

4

with federal and state law protecting patients prior to and after the incident described in the complaint and ignored the issue until recently.

## Factual Background

26. Dr. Genova was part of an emergency department practice group (NCEP) that contracted with the Defendants to provide emergency department services to the Defendants' hospital NCMC. Plaintiff has been an emergency department physician for 20 years.

27. Plaintiff had been providing emergency department services as part of his practice group (NCEP) to NCMC for approximately 10 years as of the date of the event in issue.

28. Plaintiff had consistently been active in improving medical services provided at NCMC and has served on a number of committees that address patient care issues.

29. That NCMC during all relevant times was very concerned with loss of its patient base to a competitor hospital.

30. That NCMC during all relevant times was embroiled in a very bitter and public competition with a neighboring hospital for patients.

31. Federal and State laws and NCMC have clear and strict requirements for proper emergency department receiving, evaluation/screening, and medical treatment of individuals coming to the NCMC emergency room.

32. Emergency room must be adequately staffed and have the capacity to handle and provide required emergency room care.

33. Emergency room staff must have the capacity to provide treatment as may be required to stabilize medical conditions that may endanger patient safety; this includes the ability to handle the patients with emergency conditions that require immediate attention.

34. Emergency room staff members are required to monitor its emergency room patient population to prevent overcrowding, delay and to insure proper and timely medical attention to emergency room patients.

35. Individual patients may bring actions against the hospital and individual doctors under EMTALA for violations of these requirements independent of the availability of actions against a physician or hospital for negligence.

36. That NCMC requires that physicians providing emergency room services follow written hospital procedures ("NCMC's Code Purple procedure") as well as comply with federal and state law requirements to ensure proper screening, evaluation and treatment of patients as well as control overcrowding of the emergency room which may prevent proper screening,

5

evaluation and treatment of patients coming to the emergency room, this would include stabilization of patients with serious medical conditions.

37.     Banner and NCMC intentionally interfered with Dr. Genova's agreement with his practice group when he attempted to comply with said requirements and provide timely emergency care to specific patients and reporting unsafe conditions to NCMC's CEO Rick Sutton. Said conditions if ignored would prevent required attention to screening and stabilization of patients under EMTALA requirements.

38.     The Defendants and Dr. Genova's practice group had specifically instituted the Code Purple procedure to deal these very concerns.

39.     The written policy was instituted because of dangerous conditions that had previously occurred in the emergency room which NCMC/Banner and Rick Sutton had been warned of by Dr. Genova and his practice group on various occasions.

40.     That Dr. Campain and the Board of Directors of NCEP documented the frustrations of the emergency room doctors with NCMC and Sutton's resistance to follow safety procedures long before the January 22, 2010 incident involved in this suit.  Dr. Campain outlined the issues in a 2009 email noting the following:

   a.     That safety issues raised by Dr. Genova were not new and attempts in the past had been made to prevent overcrowding and reduce wait time.

   b.     That Code Purple and other safety issues were not being implemented even though NCMC and Sutton claimed they supported the need for such procedures.

   c.     That the safety procedures which were designed to prevent crises were being ignored by Sutton and hospital management.

   d.     That Sutton and hospital administrations promises that they would notify the emergency room doctors when the hospital was at capacity and that patients who needed to be transferred would be transferred. This commitment was not met by the hospital.

   e.     That the actions of Sutton and hospital management were causing patient dissatisfaction.

### The January 22, 2010 Incident

41.     On January 22, 2010 Dr. Genova was on duty in the "NCMC" emergency room.  At approximately 2230 hours Dr. Genova and his emergency department staff and colleagues were presented with an emergency situation that required the emergency room doctors and staff to react to ensure patient safety and compliance with federal and state requirements and

6

"NCMC" procedures for patient safety in the emergency room.

42.     Dr. Genova was informed by the administrative representative (A/R) in the ER that in-patient hospital beds and emergency department beds were full.  Dr. Genova was informed by the charge nurse, Rob Hill, RN, that there were "still four ambulances out on calls"-every single ambulance available at that time of night in Weld County- and that the hospital and emergency department had no physical capacity to take another patient.

43.     Against this background  Dr. Genova was presented with an elderly lady who was having an acute heart attack and was designated a CARDIAC ALERT. Dr. Hutchison, the other physician on duty, reported evaluating another elderly patient who was experiencing acute lower gastro-intestinal bleeding and sustained two "syncopal" or "fainting episodes" from acute low blood pressure while going to the waiting room commode and waiting to come back for an available bed. Within a short period of time a second walk-in patient then arrived that Dr. Hutchison evaluated and was designated a ACARDIAC ALERT as well and was experiencing an acute heart attack with low heart rate and low blood pressure.

44.     At this point a review of the computer patient management system, PULSECHECK, indicated that every physical bed was occupied in the emergency department and that there were 10 or more patients waiting in the waiting area with a triage level of "yellow"-moderate to severe presentation symptoms-and with waiting room times in excess of 2 hours. In addition, the emergency department was holding an additional ten or more patients waiting for in-patient bed placement, some for more than several hours.

45.     The charge nurse, Rob Hill, RN, communicated to Dr. Genova that the ED nursing staff was not able to keep up with the patient load and he considered the department to be over-extended and "dangerously unsafe". Dr. Genova based on his on-site assessment, concurred. The charge nurse also informed Dr. Genova that EMS was contacting him regarding delivering one or more patients via ambulance and that he did not have a bed or physical resources to take care of this patient. The charge nurse requested that the emergency department be placed on divert.

46.     Based on the above information from the charge nurse, Dr. Genova recommended that the A/R implement the "high census" or "Code Purple" plan that had been specifically designed to address the situation faced by Plaintiff on the night in question.

47.     The A/R concurred with the decision. However, she declined to implement the policy stating that:  "regardless of what you or I think, the administrator on call refuses to divert ambulances", "nobody will do it", "and all of the managers for the in-patient units refuse to come in - especially in the middle of the night".

48.     The A/R reported back to Dr. Genova at approximately 0045 emphasizing her frustration that the administrator on call (AOC), Rick Sutton, would not allow an "ambulance diversion", which was the first step in implementing the "Code Purple" policy and asked that

7

Dr. Genova personally communicate the request to him. Dr. Genova did as the A/R requested.

49.   Dr. Genova explained to Mr. Sutton that the plan would be to take all critical patients and stabilize them to the best of the department's capability and transfer them for additional care since NCMC did not have any critical care ICU, cardiac CVCU, or pediatric beds available. Stable patients would be assessed for the possibility of diverting to another facility on a case by case basis. Dr. Genova informed Mr. Sutton that the ED was unsafe and "as the opinion of the physician on duty -- that not implementing any of my recommendations would contribute to worsening unsafe patient conditions in the department". This was part of Dr. Genova's duties per the group's agreement with Banner and requirements under federal (EMTALA) provisions and state law.

50.   That Rick Sutton ignored these concerns being more concerned about losing patients to competing hospitals.

51.   That Sutton's actions and inactions created a dangerous situation where the emergency room was in danger of not being able to provide proper timely screening of all patients coming to the emergency room.

52.   That Sutton's actions and inactions created a dangerous situation in that Sutton who was not a medical doctor was making decisions that interfered with the emergency patients already in the emergency room needing emergency attention.

53.   That Sutton's actions and inactions created a situation where the emergency room was in danger of not being able to provide proper timely treatment of seriously injured individuals being transported by ambulance or medical helicopter because pre-hospital medical personnel transporting individuals were not provided with notice of the conditions at the NCMC emergency room.

54.   That Sutton's actions and inactions exacerbated an existing dangerous situation where the emergency room was in danger of not being able to provide proper screening and/or stabilization of patients that might be received or might need to be transferred to other facilities.

**Safety Requirements for Emergency Room Patients**

55.   That EMTALA requires that hospitals providing 24 services have sufficient numbers of personnel including physicians and medical support staff.

56.   Medicare participating hospitals must meet the Emergency Medical Treatment and Labor Act (EMTALA) statute codified at  1867 of the Social Security Act, (the Act) the accompanying regulations in 42 CFR  489.24 and the related requirements at 42 CFR 489.20(l), (m), (q), and (r). Part I-Investigative Procedures, Violations of (EMTALA)

8

provisions can result in a hospital provider termination of a hospital's provider agreement and/or the imposition of civil monetary penalties (CMPs) may be imposed against hospitals or individual physicians for EMTALA violations. Part I-Investigative Procedures, General Information section."

57.    There are specific requirements for screening of patients:

a.    The person who does the examination must be specifically determined to be a "qualified medical person" by the hospital bylaws. The hospital must make the designation in its bylaws or rules and regulations. The regulation also provides that the person must "meet the requirements of 42 CFR 482.55".

b.    Section 1395dd(d)(1)(C) imposes a penalty on a physician who fails to respond to an emergency situation when he is assigned as the on-call physician. (See also item 1 under "Special Questions" below.) [pertains to ortho (something) not EM]

c.    The statute and the regulations provide that any participating hospital which has "specialized capabilities or facilities" or which is a "regional referral center" in a rural area, may not refuse to accept a patient in transfer, if it has the capacity to treat the individual. [42 USC 1395dd(g); 42 CFR 489.24(f)] The receiving hospital will be obligated to accept the transfer in most cases, so long as it has the ability to treat the patient and its capabilities exceed those of the referring hospital, even if only because of overcrowding or temporary unavailability of personnel. The receiving hospital will be obligated to accept a transfer as long as it has the "ability to treat the patient and its capabilities exceed those of the referring hospital", even if only because of overcrowding or temporary unavailability of personnel. [is NCMC a referral center? Referring hospital to hospital not hospital/street to ED]

d.    For this reason, emergency room doctors at NCMC are required to be vigilant of any circumstance that might compromise emergency room care and adequate resources to provide said services.

e.    By way of example, the regulations include a provision which imposes a significant obligation on receiving hospitals. The regulation, at 42 CFR 489.20(m), obligates a participating hospital "to report to [CMS] or the State survey agency any time it has reason to believe it may have received an individual who has been transferred in an unstable emergency medical condition from another hospital in violation of the requirements of Section 489.24(d)."

f.    Additionally, the regulations specify that a patient in a non-hospital-owned ambulance in transit is not considered to have "come to the emergency department" even if the ambulance is in contact with the hospital by telephone or by radio telemetry. Further, the regulations provide that the hospital may deny access to the patient in transit if it is in "diversionary status" -- that is, if it does not have the staff

9

or facilities to accept additional patients.

g.    Advanced notice to ambulance staff receiving injured or sick parties is critical if the receiving hospital may not be capable of providing adequate care.[NCMC could not meet its EMTALA duties to arriving (vs. transported) patients & had a duty to alert EMS].

h.    Sutton's actions and inactions directly impacted the emergency room medical staff from addressing these concerns.

i.    Physicians are bound by hospital obligations to comply with EMTALA within emergency departments. Regardless of the patient's ability to pay, under EMTALA, physicians are obligated to perform the following tasks in the emergency room:

- to screen;
- to treat a patient until stabilized;
- to comply with restrictions on transfer;
- to accept transfers; and
- to comply with notice and record-keeping requirements.

58.    Federal law requires that necessary stabilizing treatment for emergency medical conditions (including labor) be provided by a hospital and staff within their capabilities prior to an appropriate transfer of the patient to another medical facility. 42 U.S.C. 1395dd(b)(1)(A).

59.    Dr. Genova's recommendations on January 22, 2010 were carried out in the interest of patient safety and to conform to federal and state law requirements and to comply with NCMC's emergency room procedure and the agreement entered into between Dr. Genova's practice group and the Defendants.

60.    Dr. Genova was required to make the above recommendations under Federal and State law and hospital procedure and the applicable standard of care required that Dr. Genova not wait until a patient suffered an injury or death due to a lack of attention.

**Banner's Agreement with Dr. Genova Required That Dr. Genova Follow the Law**

61.    Banner's agreement with Dr. Genova and his practice group made the following commitments and requirements in the agreement with Plaintiff and are stated in pertinent part as follows:

62.    WHEREAS, Banner also has determined that effective delivery of emergency medical services requires the provision of professional service to all patients in a timely manner.

63.    The Group shall provide Emergency Medicine Services at a level consistent with the facilities available at the Hospital and the standards of care established by the relevant

medical community.

64.   Clinical Supervision and Medical Direction.

    a.   The Group Physicians, when staffing the   Department, shall provide clinical supervision to the Group Allied Health Professionals and   appropriate medical direction to other non-physician health care providers and Banner personnel working in the Department as necessary to provide medical care and services in accordance with the standards of practice for such services and for the efficient operation of the Department.

65.   Applicable Standards.

    a.   The Group agrees to provide Emergency Medicine Services in an able, efficient, and competent manner. The Group agrees that the Emergency Medicine Services provided hereunder shall (a) meet the standards of the American Medical Association, the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"), the American College of Emergency Physicians, the Department of Health and Human  Services ("HHS"), and any other federal, state, or local government agency exercising authority with respect to the Department, (b) comply with the Hospital's Trauma  Operational Guidelines, as currently in effect or as may be amended or modified from time  to time ("the Trauma Operational Guidelines"), and any other standard set forth by the  State of Colorado to maintain a Level II Trauma Designation, and (c) in no instance be less than professionally recognized standards of practice. In addition, the Group agrees that the Group Practitioners, as members of the Medical Staff or the Allied health Professional Staff, as the case may be shall abide by applicable Hospital Policies.

66.   Emergency Medicine Services.

    a.   Each Group Practitioner shall perform the services required hereunder in accordance with all applicable federal, state, and local laws, rules and regulations, all applicable standards of JCAHO and any other relevant accrediting organizations, and all applicable Hospital Policies.

### CEO Sutton

67.   The CEO on duty, Rick Sutton, who was off site during the emergency situation, was unprepared, not trained and not acquainted with the computer patient safety equipment  to address a number of the issues involved in the situation faced by the emergency room staff on January 22, 2010 even though he was required to be prepared to address said issues.

68.   Sutton had previously demonstrated his lack of knowledge of hospital and emergency room procedures and publically acknowledged the same in February of 2010.

69.   Additionally, Sutton is not and was not a medical doctor and neither Sutton nor NCMC, a corporation, were authorized to practice medicine. In spite of this, Sutton interfered and attempted to interfere with medical care considerations involved in the various emergency care situations that arose on January 22, 2010 as he had done on previous occasions.

70.   Sutton did not have the required medical knowledge and was not able to evaluate the medical conditions of the three medical emergency patients that were being treated by the emergency room doctors on January 22, 2010.

71.   Sutton's/NCMC's actions were a direct attempt to usurp and ignore the importance of Plaintiff's ability to be in the best situation to evaluate patient care and safety issues.

72.   That Sutton and NCMC's business concerns i.e. loss of patient business, should not have outweighed concerns about patient safety.

73.   Sutton resisted implementing the "Code Purple Safety Program", putting patients at risk and Sutton retaliated against plaintiff, a medical provider, as defined by EMTALA for recommending the implementation of the program to protect patients.

74.   That the prohibitions of retaliation protect not only employees, but also medical providers who are not employees of a hospital but are providing emergency services to a hospital.

75.   That while agreeing to institute a policy that specifically addressed the emergency situation faced by Plaintiff on January 22, 2010, the Defendant and Sutton had consistently refused to carry out the policy causing emergency room staff to have little faith that the policy would be instituted on January 22, 2010.

76.   That as a result of Dr. Genova's stated worries and recommendations conveyed to Sutton on January 22, 2010, Sutton retaliated against Dr. Genova and arbitrarily forced Dr. Genova's practice group to forbid Dr. Genova from taking any further emergency room shifts, which in effect ended Plaintiff's sole source of income.

77.   That the requested action by Defendants was made to Dr. Genova's group under threat of terminating the practice groups' emergency service contract with the Defendants.

78.   Emergency room physicians such as Dr. Genova  should not be forced to work under an agreement that arbitrarily requires them to carry out certain patient safety procedures  to comply with their agreement with NCMC and federal and state law requirements, only to be forced to resign when they attempt to recommend actions to protect patients as required by their professional standards and their medical obligations under Federal and State law and the agreement between their practice group and NCMC.

79.   The language in Banner's agreement with Dr. Genova's practice group does not allow for arbitrary removal of any emergency department physician from providing services and

12

certainly does not permit Banner to force Dr. Genova's practice group to forbid Dr. Genova from providing emergency department services under the threat of termination of the entire group's agreement with Banner.

80.    That Defendants' recent action of terminating its relationship with Dr. Genova's former practice group, in spite of the group having outstanding patient evaluations, reveals the Defendants had an alternative motive for changing its emergency department management.

## FIRST CLAIM FOR RELIEF
(Plaintiff against Defendants Banner and NCMC - Claim for Breach of Contract)

81.    The allegations of Paragraphs 1 through 80 of this Complaint are re-alleged and incorporated by reference here with the same force and effects as though set forth here in full.

82.    Defendants, Banner and NCMC, entered into a contract with Plaintiff's practice group and Plaintiff, and, therefore, Plaintiff, to employ, and/or allow Dr. Genova and other members of Plaintiff's practice group privileges as emergency room physicians at NCMC.

83.    The express terms of the employment specifically included the assurances, promises and contractual undertakings described elsewhere herein and expressly or impliedly included the provision that Plaintiff's employment(s) and clinical practice(s) would be in accordance with the by-laws of NCMC and administrative regulations, practices and procedures of NCMC.

84.    That Defendants' agreement with Plaintiff and his practice group required Plaintiff follow all federal and state laws, regulations, professional standards and hospital procedure to insure the safety of patients in the emergency room.

85.    Plaintiff fulfilled his obligations under the agreement.

86.    Defendants, Banner/NCMC and NCEP, breached their contract with Plaintiff by acquiescing in and, in fact, ratifying, Sutton's actions of intentionally interfering with Plaintiff's efforts to comply with the contract requirements when Defendants knew or should have known that Plaintiff was required to take certain actions to protect patients being seen and or treated in the emergency room under federal and state law requirements.

87.    Defendants Banner, NCMC and NCEP breached their contract with Plaintiffs by acquiescing in and failing to investigate or carry out any reasonable investigation of Sutton's arbitrary action before Sutton threatened Plaintiff's practice group with the termination of its agreement with the Defendants if Dr. Genova was allowed to continue with emergency care at NCMC.

88.    Defendants, Banner, NCMC and NCEP, breached their contract with Plaintiff by allowing Sutton to engage in extortionate actions to cause Plaintiff's practice group to constructively

13

dismiss Plaintiff from the practice group. Defendants, through their administrators, knew or should have known that the actions taken by Sutton against Plaintiff were without merit and in retaliation for following the law and that Plaintiff's source of income would be effectively ended even if Plaintiff was still part of the practice group.

89.  Defendants, Banner and NCMC, breached their contract by failing to train and require that Sutton as CEO to be familiar with the law, medical standards, and hospital procedures for providing safe care to emergency room patients resulting in Sutton's misguided action against the Plaintiff which it has as much admitted on February 22, 2011.

90.  Banner's and NCMC's administrative inaction and failure and refusal to act, caused the damages claimed by the Plaintiff.

91.  Because of the actions and inactions of Defendants Banner and NCMC committed against Plaintiff, as described herein-above, Plaintiff's ability to perform his obligations pursuant to his agreement with his practice group would be defeated as Dr. Genova's sole source of income was provided by Defendants' agreement with Plaintiff and his practice group.

92.  Plaintiff has incurred, and is continuing to incur, economic and non-economic damages, including damage to his reputation, which was, and is, a natural and probable consequence of the breach by Defendants, Banner and NCMC, of their contract with Plaintiff, as described elsewhere herein.

93.  At all relevant times Defendants, Banner and NCMC, actually knew, and/or reasonably could have known and anticipated from the facts and circumstances, and/or should have known, that Plaintiff would probably incur these damages, injuries and losses if these Defendants breached their contract with Plaintiff.

## SECOND CLAIM FOR RELIEF
(Plaintiff's Claim for Tortious Interference with Contract)

94.  The allegations of Paragraphs 1 through 93 of this Complaint are re-alleged and incorporated by reference here with the same force and effects as though set forth here in full.

95.  Plaintiff and his practice group entered into an agreement with Defendants to provide certain medical services for NCMC. Said agreement provided Plaintiff with a monthly flow of income that before Defendants' tortious acts averaged approximately $30,000 to $40,000.00 dollars per month.

96.  Plaintiff's sole service under the agreement was to provide emergency room coverage for NCMC.

97.  Defendants intentionally interfered with Plaintiff's agreement with his practice group by forcing Plaintiff's practice group to prohibit Plaintiff from providing any further emergency

14

room services at NCMC or face termination of the group's entire agreement to provide said services to NCMC.

98.   That Defendants actions including Sutton's actions were arbitrary and against the law, in violation of NCMC's agreement with Plaintiff and in violation of public policy as Plaintiff, and Plaintiff's practice group were required to comply with federal and state law requirements to protect members of the public utilizing NCMC's emergency room.

99.   That Defendant's actions and Sutton's actions were in retaliation for reporting unsafe conditions and recommending safety procedures to address said issues.

100.  That Plaintiff's actions are protected from retaliation under Federal law (EMTALA).

101.  Because of the actions and inactions of Defendants Banner and NCMC committed against Plaintiff, as described herein-above, Plaintiff's ability to perform his obligations pursuant to his agreement with his practice group would be defeated as Plaintiff's sole source of income was provided by Defendants' agreement with Plaintiff and his practice group to provide emergency room services for NCMC.

102.  As a result of the Defendant's actions Plaintiff has suffered anxiety, embarrassment, humiliation, together with economic losses, including loss of earnings and income, capital investments in said group, relocation and other business expenses, loss of future earning capacity, and the real possibility of not being able to practice in his chosen field of emergency medicine in the future or with lesser compensation.

103.  The actions of NCMC's CEO Sutton were ratified and/or approved by Banner and NCMC which makes them directly and/or vicariously responsible for the acts, errors and omissions of its CEO.

### THIRD CLAIM FOR RELIEF
(Plaintiff against Defendants Sutton, Banner and NCMC)

## VIOLATION OF THE EMERGENCY MEDICAL TREATMENT AND ACTIVE LABOR ACT, 42 U.S.C. 1395dd

104.  Under EMTALA, a hospital may not penalize or take adverse action against a qualified medical person described in subsection (c)(1)(A)(iii) or against any hospital employee because the employee reports a violation of a requirement of this section. Plaintiff is a qualified medical person under the statute.

105.  The Defendants retaliated against Plaintiff for disclosing, objecting to and/or refusing to participate in an activity, policy or practice which Plaintiff reasonably believed was in violation of the Emergency Medical Treatment and Active Labor Act.

15

106.   As a consequence of the Defendant Hospital's actions, Plaintiff suffered and continues to suffer damages, including, but not limited to, loss of income, loss of employment benefits, other financial losses, loss of professional opportunities, loss of personal and professional reputation, loss of community standing, and emotional and mental distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, and each of them, pray that final judgment be entered in their favor and against the Defendants, and each of them, declaring, ordering and adjudging:

a.   That Defendants, and each of them, be adjudged liable, jointly and severally, for compensatory damages in an amount to be proved at trial, and awarded to the Plaintiff, and each of them;

b.   That Plaintiff recover all appropriate litigation filing fees, expert and lay witness fees, and other litigation costs in accordance with Colorado and federal law;

c.   That Plaintiff, recover reasonable attorney's fees and costs, including expert witness fees and expenses, to the extent allowed by Colorado law;

d.   That Plaintiff be awarded statutory interest (both pre- and post-judgment, as provided by Colorado law)

e.   For pre- and post-judgment interest on all sums awarded, according to proof; and,

f.   For such other and further relief as this Court may deem just and proper.

## JURY DEMAND

## PLAINTIFFS HEREBY DEMAND TRIAL BY JURY ON ALL ISSUES HEREIN SO TRIABLE.

DATED: April 28, 2011

Respectfully submitted,

CHARLES H. TORRES, P.C.

By:_(Original Duly Executed by Charles H. Torres, Esq.and available for Inspection at the Law Offices of Charles H. Torres, P.C._
Charles H. Torres, Esq. (Colorado Bar #: 7986)

16

303 E. 17th Ave, Suite 920
Denver, Colorado  80203
ATTORNEY FOR PLAINTIFF


Plaintiff's Address:

Ron Genova
16450 W. Van Buren St.
Goodyear, AZ 85338