IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 11-cv-01139-RBJ-MJW

RON GENOVA, M.D.

      Plaintiff,

v.

BANNER HEALTH, an Arizona non-profit corporation,
d/b/a North Colorado Medical Center, and
RICK SUTTON, individually and as CEO and an employee of North Colorado Medical
Center,

      Defendants.

---

## ORDER

---

    This matter comes before the Court on defendants' motion for summary judgment
[docket #52].  In addition to considering the parties initial briefs, the Court heard oral argument
and has permitted, received and considered supplemental briefs following argument.

**Facts**

    Ron Genova, M.D. is an emergency medicine specialist.  At times relevant to this lawsuit
he was part of an emergency department practice group known as the North Colorado
Emergency Physicians, P.C. ("NCEP").  NCEP contracted with defendant Banner Health
("Banner"), which does business as the North Colorado Medical Center ("the hospital") to serve
as the sole emergency medicine physicians in the hospital's emergency department.

    This lawsuit arises out of an incident that began on the night of January 21, 2010.  Dr.
Genova was an on-duty emergency room physician at the hospital that evening.  He alleges that
at approximately 10:30 p.m. he was informed by an administrative representative and a charge

1

nurse that the hospital was facing a potentially serious overcrowding situation.  Amended

Complaint [#23] at ¶41.  The administrative representative indicated that all in-patient hospital

beds and emergency department beds were full.  *Id.* ¶42.  The nurse indicated that there were

four ambulances out on calls, and that the hospital and emergency department had no physical

capacity to take another patient.  *Id.*  The nurse recommended that emergency department be

place on "divert."  *Id.* ¶45.  This means that ambulances would be diverted to other hospitals.

Dr. Genova recommended that the administrative representative implement the hospital's

plan named "Code Purple."  *Id.* ¶46.  This plan was designed to "maintain patient safety when

the hospital population is at a critical level, and "[t]o provide a mechanism that will decompress

patient volume…."  Code Purple [#55-4] at 1.  Dr. Genova alleges that the administrative

representative agreed this would be appropriate but refused to implement the plan because she

believed that Banner's Chief Executive Officer, defendant Rick Sutton, would not divert

ambulances.  Amended Complaint ¶47.  Dr. Genova then called Mr. Sutton and recommended

that the plan be implemented.  He alleges that Mr. Sutton ignored his concerns.  *Id.* ¶50.

There is no dispute that the hospital was busy that night.  However, the parties do dispute

the nature of the phone conversation between Dr. Genova and Mr. Sutton, and they also dispute

whether "Code Purple" was necessary.  Mr. Sutton claims that Dr. Genova was frustrated and

angry, and that he threatened to take actions that would jeopardize patient safety.  He claims that

Dr. Genova said that "we are going to go out.  We're going to go on EMS divert.  We're going to

go tell people in the waiting room they need to go home.  We are going to turn the lights off,

lock the doors.  We are going to close this down because we need to be on divert.  I'm the

captain of the ship."  Sutton Depo.  [#52-3] at 45.  Defendants also claim that Mr. Sutton called

Dr. Campain, the medical director of NCEP, to assess the situation that night.  Dr. Campain

called another emergency department physician who was at the hospital, Dr. Hutchison, to find out what was happening. Dr. Hutchison replied, "[y]ou know, we're busy, but we're getting through it." Hutchison Depo. [#52-6] at 192. Dr. Campain told Mr. Sutton that neither ambulance divert nor ambulance advisory[1] was necessary. Sutton Depo. at 46-47. In contrast, Dr. Genova alleges that Mr. Sutton was concerned about losing patients to competing hospitals, and as a result, he refused to implement the Code Purple plan and divert ambulances to other hospitals. Amended Complaint ¶¶50, 73.

Dr. Genova alleges that as a result of Dr. Genova's expressions of concern and recommendations to Mr. Sutton that evening, Banner forced NCEP to forbid him from taking any further emergency room shifts in the hospital. This effectively deprived him of his sole source of income. *Id.* ¶76. Dr. Genova filed this lawsuit, asserting three claims: (1) breach by Banner of its contract with NCEP; (2) tortious interference by both defendants with Dr. Genova's contract with NCEP; and (3) violation by both defendants of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd.

**Standard**

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty*

---

[1] Advisory status means that "[p]atient destination decisions are made on a case-by-case basis for all patients arriving via Emergency medical services through online medical control (Emergency Department physician)." [#55-4] at 1.

*Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248. The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  *Concrete Works of Colorado, Inc. v. City and County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

**Conclusions**

First Claim: Breach of Contract

Banner argues that it had no contract with Dr. Genova.  Plaintiff responds that he can assert breach of the contract between Banner and NCEP because (1) NCEP acted as his agent; (2) his contract with NCEP makes him a party to the contract; and (3) he is a third party beneficiary of the Banner-NCEP contract.  The Court need not address the first or second theory.

NCEP is a group of emergency room physicians who, like Dr. Genova, are either employed or retained by the group.  Banner-NCEP contract [#52-2] at 14, ¶3.1.  The group fulfills its obligations under the contract solely through the services of the "group physicians" and allied health professionals, collectively known as the "group practitioners." *Id.*  In return, Banner's obligations are to the group.  In the contract's recitals Banner expresses its desire to provide the group an exclusive arrangement. *Id.*  This is intended to help the group realize economies resulting from Banner's general administrative expertise and to relieve the group from nonmedical demands place upon professional time. *Id.*  The beneficiaries of the economies and saving of professional time are the group practitioners.  Banner promises that the Group will receive compensation consistent with the fair market value of the services provided. *Id.* at 19, ¶5.6.  The recipients of compensation are the group practitioners.

An individual may enforce a contractual obligation made for his benefit even though he was not a party to the contract if the obligation is "apparent from express provisions of the contract or some equivalent terms showing such obligation." *Cox v. Fremont County Public Bldg. Authority*, 415 F.2d 882, 889-90 (10th Cir. 1969). The Court finds and concludes from the express provisions of the contract that the group practitioners, including the group physicians, were the known and intended beneficiaries of Banner's obligations under the contract. NCEP is, in substance, little more than the group practitioners. As such, a group physician such as Dr. Genova has the right to sue for an alleged breach of the contract.

However, one must take the bad with the good. Paragraph 3.2 of the contract, headed "Qualifications of the Group Practitioners," provides among other things:

> (k) Each Group Practitioner shall perform the services required hereunder in accordance with all applicable federal, state, and local laws, rules and regulations, all applicable standards of JCAHO and any other relevant accrediting organizations, and all applicable Hospital Policies.
>
> . . .
>
> (m) Each Group Practitioner shall conduct himself/herself in a manner that is not contrary to the interests, reputation or good will of Banner or to the efficient and appropriate operation of the Hospital.
>
> . . .
>
> If, at any time, any Group Practitioner fails to meet any of the above requirements, Banner shall notify the Group in writing of this fact. The Group, upon receipt of such notification, shall immediately remove the Group Practitioner in question from all duties pursuant to this Agreement…If the Group fails to comply with the terms of this Section 3.2, Banner may, at its option, immediately terminate this Agreement.

*Id*. at 15-16.

On February 4, 2010, CEO Sutton delivered a letter to NCEP's medical director, Dr. Campain, and NCEP's assistant medical director, Dr. Hutchison, invoking section 3.2 of the

contract and requesting that the group immediately remove Dr. Genova from all duties at the hospital.  [#52-15].  The letter expressed Banner's opinion that Dr. Genova had failed to meet the requirements of sections (k) and (m) of section 3.2 by (1) insisting on January 22, 2010 that the hospital be placed on divert status and that people in the waiting room be sent home if they were not seriously ill, notwithstanding that, according to Dr. Campain, the issues at the hospital were being addressed; (2) refusing to transfer patients to the McKee Medical Center (another Banner facility) on December 18, 2009 when the hospital was full, after which another physician agreed to transfer the patients; and (3) refusing to transfer patients to the McKee Medical Center on another occasion on grounds that the required paperwork took too much of his time.  *Id.*  The letter concluded that this conduct was unprofessional and inconsistent with the interests, reputation and goodwill of the hospital.  *Id.*

Whether Dr. Genova's alleged conduct was unprofessional, and specifically, whether the three incidents or any of them were fairly and accurately portrayed, certainly would be matters of genuine factual dispute.  However, such disputes are not material.  Paragraph 3.2(m) of the contract effectively gives Banner carte blanche to request the removal of a physician whenever Banner determines that the physician has conducted himself in a manner that is contrary to Banner's interests.

During oral argument counsel for Dr. Genova did not dispute that the contract grants Banner broad authority to request that a physician be removed, with or without cause.  Rather, plaintiff suggests that this provision should be declared void as unconscionable and contrary to public policy.  However, this is a contract between and among sophisticated parties.  Counsel conceded that NCEP and Banner were both represented by legal counsel.  The contract itself provides, "[t]he parties to his Agreement and their respective counsel have mutually contributed

to its drafting.  Consequently, no provision of this Agreement shall be construed against either party on the ground that such party drafted the provision or caused it to be drafted or the provision contains a covenant of such party." [#52-2] at 31, ¶10.16.  Plaintiff provides no authorities suggesting that a court could void a contractual provision as unconscionable or contrary to public policy in such circumstances.

During the June 29, 2012 the Court questioned counsel about a different concept.  Under Colorado law, "every contract contains an implied covenant of good faith and fair dealing." *Amoco Oil Co. v. Ervin,* 908 P.2d 493, 498 (Colo. 1995).  The duty to act in good faith arises when the contract grants a party discretionary authority.  The party may not exercise its discretion in a manner that defeats the reasonable expectations of the other party.  *Id.*  The implied covenant exists even when a contract states that there are no implied covenants.  *Id.* at 499.  Even where the plaintiff has not asserted an independent cause of action for breach of the implied covenant of good faith and fair dealing, the assertion of a breach of the contract and facts that could show a breach of the implied covenant states a claim.  *See Denny Const., Incl. v. City and County of Denver,* 170 P.3d 733 (Colo. App. 2007), *rev'd on other grounds,* 199 P.3d 742 (Colo. 2009).

The Court is willing to assume that plaintiff's complaint implicitly, though certainly not expressly, asserts a breach of the implied covenant, i.e., that Banner could not exercise its discretion under section 3.2 of the contract in a manner that defeats Dr. Genova's reasonable expectations.  For example, it might be that his reasonable expectation is that if he was at all times a competent emergency room physician (which is not disputed) and complied with all applicable professional standards (which is not disputed), then he could continue to practice at the hospital with the rest of the group absent some form of misconduct that in fact compromised

the best interest of the hospital or its patients.  As such, the claim would present genuinely disputed issues of material fact that would not be appropriate for summary disposition.

The problem is that even this construction of Dr. Genova's claim runs headfirst into the terms of another agreement.  The Banner-NCEP contract [#52-2] required that each group physician execute a "Joinder Agreement" in the form attached thereto as Exhibit F-1.  *Id.* at 16, ¶3.3(a).  Dr. Genova did execute a Joinder Agreement in the required form.  [#52-4].  Banner is expressly made a beneficiary of the Joinder Agreement.  *Id.* ¶3.

The Joinder Agreement, subtitled "Release and Waiver," expressly required Dr. Genova to certify, "I currently meet, and that I shall continue to meet in the future, all of the applicable requirements set forth in Section 3.2 of the Agreement."  *Id.* ¶1.  It continues:

> I hereby agree that when I am replaced, when my services are discontinued at the Hospital…I shall, without notice, hearing or other due process, automatically and irrevocably be deemed to have resigned from the Medical Staff, and shall not thereafter be entitled to provide at the Hospital any of the professional services previously provided by me pursuant to this Agreement.  I further agree to waive any and all procedural or due process safeguards to the contrary provided in the Medical Staff Bylaws, the Medical Staff Corrective Action/Fair Hearing Plan and any other Medical Staff document.  *I hereby release Banner, the Hospital, the Medical Staff, the CEO, and their agents, employees and attorneys from any liability, claim, cause of action or demand connected with the termination of my Medical Staff membership and clinical privileges as herein provided.  I further agree to indemnify and hold harmless Banner from and against all obligations, claims, costs, debts, demands, controversies, expenses, attorneys' fees, damages, losses and causes of action, of any kind whatsoever, whether known or unknown, arising from termination or non-renewal of the Agreement or the termination of my relationship with the Group.*

*Id.* ¶2.

In short, this is a very broad waiver of Dr. Genova's right to sue Banner for breach of the Banner-NCEP contract.  The parties to the Joinder Agreement anticipated the possibility that his services could be discontinued at the hospital and provided that this would be deemed have been

his resignation from the medical staff.  He specifically released Banner and CEO Sutton from any claim connected with the termination of his medical staff membership.

Plaintiff argues that the waiver should not preclude his claim, because he did not lose his privileges at the hospital; he is still a member of the NCEP group; he has not received any medical or disciplinary action; and, in any event, the Joinder Agreement is void as a matter of public policy.  Supplemental brief [#76] at 3-4.  The fact that his clinical privileges were not revoked (for his benefit, according to the defendants) does not detract from the fact that his services at the hospital were discontinued, that he was deemed (again, for his benefit, according to the defendants) to have resigned from the medical staff; and that his medical staff membership was terminated.  He waived and released claims connected with that termination.  The facts of his continued membership of the NCEP group and the absence of any disciplinary actions have no bearing on the enforceability of the waiver in the Joinder agreement.

Regarding public policy, Dr. Genova argues that his services were discontinued for "making recommendations he was required to make."  *Id.* at 4.  He analogizes this situation to cases holding that it is a violation of public policy to terminate an at will employee for refusing to perform an illegal act or for performing a public duty or exercising an important job-related right or privilege.  *See, e.g., Coors Brewing Co. v. Floyd,* 978 P2d 663, 666-67 (Colo. 1999); *Bonidy v. Vail Valley Ctr., P.C.*, 232 P.3d 277, 281 (Colo. App. 2010).  Although this is not an employment case as such, I am willing to assume that Banner could not require the group to remove Dr. Genova from the list for refusing to perform an illegal act or for performing an important public duty, and that if he was terminated on that basis, the waiver would be void as well.

However, plaintiff has presented no evidence that he was "terminated" for those reasons. I accept the fact that Dr. Genova believes that he had an obligation to patients to recommend that the hospital invoke the Code Purple plan on January 22, 2010.  I will presume that he had reasonable grounds for making that recommendation.  However, he has come forward with no evidence that Banner's demand that he be excluded from continuing to practice in its emergency department was motivated by his having refused to perform an illegal act or even by the fact of his having made the Code Purple recommendation.

Rather, the evidence in the record is that Banner's decision was motivated by Mr. Sutton's negative reaction to the manner in which Dr. Genova made his recommendation; the opinions of two other NCEP doctors that the hospital was keeping up with the demand; and Dr. Genova's refusal on other occasions to transfer patients to an affiliated hospital.  Those reasons may or may not be good ones.  However, to void a contract, including the waiver provision in the Joinder Agreement, that was entered into between sophisticated parties represented by counsel on public policy grounds, the jury would have to find, based upon direct or circumstantial evidence, that Banner effectively discharged Dr. Genova because he exercised his right as a physician to request that the Code Purple policy be invoked.  I conclude that even construing the evidence in plaintiff's favor for summary judgment purposes, he has not shown that there is a genuine dispute of fact requiring a trial.

Therefore, the Court grants the motion and dismisses the claim based upon breach of the Banner-NECP contract.  This is not necessarily a result that the Court likes.  I recognize that he is a fine physician, that he was arguably poorly treated, and that he and his lawyer have put a great deal of time and effort into this lawsuit.  I have at least tried to write this order in a way that explains to him why I have come to the conclusions I have.  Essentially, a contract is a contract.

<u>Second Claim: Tortious Interference with Contract</u>.

The elements of the tort of intentional interference with contractual obligations under Colorado law are that the defendant (1) is aware of a contract between the plaintiff and a third party, (2) intends that the third party breach the contract, and (3) induces the third party to breach of to make it impossible for the plaintiff to perform the contract. *Krystkowiak v. W.O. Brisben Companies, Inc.,* 90 P.3d 859, 871 (Colo. 2004). *See Lutfi v. Brighton Community Hospital Association,* 40 P.3d 51, 58 (Colo. App. 2001); *Comtrol, Inc. v. Mountain States Telephone and Telegraph Co.,* 513 P.2d 1082 (Colo. App. 1973). Dr. Genova alleges that defendants "intentionally interfered with Plaintiff's agreement with his practice group by forcing Plaintiff's practice group to prohibit Plaintiff from providing any further emergency room services at NCMC (the hospital) or face termination of the group's entire agreement to provide services to NCMC. Amended Complaint [#23] ¶97.

This claim fails for two reasons. First, plaintiff has not alleged, and certainly has not produced evidence showing, that NCEP was even in breach of any contractual obligation to him. NCEP had certain obligations to Dr. Genova under the terms of a Shareholder Employment Agreement. [#52-1]. Among other things, NCEP agreed to pay him $110 an hour for daytime hours and $125 an hour for evening hours for service provided to patients treated at the North Colorado Medical Center pursuant to NCEPs contract with Banner. *Id.* ¶4.1.1. There is no evidence that NCEP did not comply with that obligation or other obligations under this contract or under the Joinder Agreement between Dr. Genova and NCEP.

Second, as discussed above, by executing the Joinder Agreement Dr. Genova waived and released Banner and CEO Sutton from any claim connected with the termination of his medical staff membership.

Accordingly, the Court grants the motion and dismisses the Second Claim for Relief.

Third Claim: EMTALA

The Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, was enacted to address the problem of "dumping" patients without health insurance who need medical care. *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 796 (10th Cir. 2001). EMTALA requires participating hospitals, such as Banner, (1) to conduct an initial medical examination to determine if an emergency medical condition exists, and (2) if an emergency medical condition exists, to stabilize the patient before transporting him or her elsewhere. *Id.* "Congress enacted EMTALA in 1996, in the face of the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance." *Reynolds v. MaineGeneral Health*, 218 F.3d 78, 83 (1st Cir. 2000)(internal quotations omitted). "Its core purpose is to get patients into the system who might otherwise go untreated and be left without a remedy because traditional medical malpractice law affords no claim for failure to treat." *St. Anthony Hosp. v. U.S. Dept. of Health*, 309 F.3d 680, 694 (10th Cir. 2002)(quoting *Bryan v. Rectors & Visitors,* 95 F.3d 349, 351 (4th Cir. 1996)).

The EMTALA contains two sections providing a private right of action to individuals: (1) a civil enforcement provision for "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section…." 42 U.S.C. § 1395dd(d)(2)(A); and (2) a whistleblower provision for physicians or hospital employees:

> A participating hospital may not penalize or take adverse action against a qualified medical person described in subsection (c)(1)(A)(iii) of this section or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or against any hospital employee because the employee reports a violation of a requirement of this section.

42 U.S.C. § 1395dd(i).  Plaintiff's claim appears to be pursuant to this whistleblower provision, as he alleges that defendants retaliated against him for "disclosing, objecting to and/or refusing to participate in an activity, policy or practice which Plaintiff reasonably believed was in violation of the [EMTALA]."  [#23] ¶ 106.  However, much of plaintiff's briefing and other portions of his complaint appear to encompass a larger argument.

If the Court correctly understands the factual allegations that Dr. Genova believes support an EMTALA claim, then included that Banner created dangerous conditions in its hospital by understaffing; Dr. Genova had complained about these conditions and inadequate patient care in the past; Dr. Genova complained about Banner's failure to follow its own internal policies; the emergency department physicians were frustrated with Banner and Mr. Sutton; the hospital was extremely busy the night in question; Dr. Genova felt that implementation of Code Purple and the diversion of ambulances, or at least advisory status, was necessary; Mr. Sutton refused because he did not want to lose the business; and as a result of Dr. Genova's attempts to divert ambulances and initiate the Code Purple plan, Mr. Sutton retaliated against him by removing him from future shifts.  He appears to argue that those facts support two different EMTALA claims, one specific to the night in question, and the other a more general allegation that defendants retaliated against him as a cumulative result of his refusal to cooperate with practices he thought would violate the EMTALA.

These allegations, if true, describe conduct that is concerning.  If true, there surely must be a means to report and remedy the problems.  There may be a legal claim.  Certainly the factual support offered in support of the allegations are sufficient to create a genuine dispute of fact that would preclude summary judgment if they were material to the resolution of the claim asserted.  However, they are not material to a claim under the EMTALA.

No evidence has been presented, indeed no allegation has been made, that Banner, its emergency department, or any person employed by Banner, has ever refused to conduct an initial medical examination of any person appearing at the hospital to determine if an emergency medical condition exists.  Likewise, there is no allegation or evidence that any person has not been stabilized before being transported to another hospital.  There is no allegation that any adverse action was ever taken against Dr. Genova because he refused to authorize the transfer of an individual with an emergency medical condition who had not been stabilized.  There is no allegation that any adverse action was ever taken against Dr. Genova because he reported a violation of the requirement that a patient receive an initial medical examination and, if appropriate, be stabilized before being transferred.  In short, conduct that would violate the EMTALA and would support a cause of action has not been alleged in this case.

On the contrary, this case concerns two types of alleged misconduct: (1) the hospital's refusal to divert prospective patients on January 22, 2010; and (2) Dr. Genova's refusal to cooperate in the transfer of patients from this hospital to another Banner hospital on prior occasions.  The refusal to divert (or go to advisory status) is the opposite of dumping patients.  Penalizing Dr. Genova for refusing to transfer patients to the McKee Medical Center, or to any other hospital, could support an EMTALA claim if he refused because the patient had not been properly screened and stabilized.  However, that is not what has been alleged in this case.

Plaintiff repeatedly argues that Banner failed to follow its own practices and procedures.  Courts do consider whether a hospital adhered to its own procedures in considering a claim under the EMTALA.  *See, e.g., Repp v. Anadarko Municipal Hospital*, 43 F.3d 519, 522-23(10th Cir. 1994)(hospital provided "appropriate medical screening" within the meaning of EMTALA, 42 U.S.C. § 1395dd(a), when it followed its own screening procedures before discharging a

patient); *Parker v. Salina Regional Health Center, Inc.*, 463 F.Supp.2d 1263, 1269 (D. Kan. 2006)(a court's duty in an EMTALA case is to determine whether the hospital adhered to its own screening procedures).  The importance of those cases here, however, is that they emphasize that EMTALA concerns whether a hospital has appropriate procedures for screening individuals who appear at the hospital.  That is not what the present case is about.  EMTALA does not create a general cause of action for violation of any hospital procedure or for violating standard medical procedures.  It is not a federal malpractice or negligence statute.  *Parker,* 463 F. Supp. 2d at 1267.

Plaintiff has sporadically cited regulations pertaining to hospitals that participate in Medicare and Medicaid, seemingly arguing that a hospital's failure to implement a particular regulation constitutes an EMTALA violation that Dr. Genova can enforce.  *See* Response [# 55] at 3, 5, 35; Supplement [#76] at 2-3.  I mention this only to assure him that I have tried to determine whether any federal regulation creates a cause of action that is not apparent on the face of the EMTALA.  I conclude that there is none.  Simply put, one cannot put a square peg into a round hole.  The EMTALA is a powerful, but limited, statute.  The Court cannot find anything in the statute that provides a legal basis for the claim asserted in this case.

**Order**

1. Motion [#52] is GRANTED.  The Court enters its final judgment in favor of the defendants, Banner Health d/b/a North Colorado Medical Center, and Rick Sutton, dismissing plaintiff's claims and this civil action with prejudice.

2. This order moots all other pending motions.  The trial is vacated.

3. Defendants are awarded their reasonable costs.

DATED this 11th day of July, 2012.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge